UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| TROY ALLEN SYKES,<br><br>            Petitioner,<br><br>      v.<br><br>PEOPLE OF THE STATE OF<br>CALIFORNIA,<br><br>            Respondent. | Case No. CV 14-5387-DFM<br><br>OPINION AND ORDER |

## I.

## BACKGROUND

**A.    <u>Procedural History</u>**

   A jury convicted Petitioner Troy Allen Sykes ("Petitioner") of attempted voluntary manslaughter, felony child endangerment, and first degree residential burglary. Respondent's Notice of Lodging, Lodged Document ("LD") 1 at 1. The jury also found true allegations that Petitioner personally used a firearm during the commission of the offenses and that a person other than an accomplice was present in the residence during the commission of the burglary. <u>Id.</u> The trial court sentenced Petitioner to 25 years in state prison. <u>Id.</u> at 1-2.

Petitioner directly appealed to the California Court of Appeal, arguing that the trial court erred by (1) giving jury instructions that erroneously defined the mental state necessary to convict him of felony child endangerment, in violation of his federal constitutional rights to due process and a jury trial; (2) failing to give a jury instruction on the same offense that required actual awareness of the facts that resulted in the mental suffering and endangerment of the child; and (3) failing to stay his sentence on the burglary count because the burglary was incidental to the attempted voluntary manslaughter for which he was separately sentenced. Respondent's Supplemental Notice of Lodging ("Supp. LD") 7 at 6-26. The Court of Appeal issued a reasoned decision affirming Petitioner's conviction. LD 1.

Petitioner filed a petition for review in the California Supreme Court. LD 2. Petitioner argued: (1) that he was denied his federal constitutional rights to due process and a fair trial by the trial court's erroneous instructions regarding the mental state required for child endangerment; (2) that the trial court erred by instructing the jury with CALCRIM No. 821 and CALCRIM No. 250 because it failed to require a showing that Petitioner was actually aware of the child's presence; and (3) that the trial court violated his federal constitutional right to due process by imposing a consecutive sentence for burglary. Id. at 10-25. On August 14, 2013, the California Supreme Court denied review without comment. LD 3.

On July 11, 2014, Petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody, alleging three grounds for habeas relief. Dkt. 1 ("Petition"). On September 11, 2014, Respondent filed a motion to dismiss contending that the Petition should be dismissed as a "mixed" petition. Respondent argued that Petitioner had failed to exhaust his state remedies with respect to the claim that the trial court's instructions failed to require a showing that he was actually aware of the child's presence. Dkt. 8. Petitioner did not

2

file a timely opposition to Respondent's motion to dismiss. See Dkt. 3 at 2 (providing that an opposition to motion to dismiss must be filed within 20 days of service of the motion). On October 20, 2014, this Court issued an Order to Show Cause ("OSC") requiring that, on or before November 17, 2014, Petitioner either (a) file a stay-and-abeyance motion if he believed that he would be able to make the requisite three showings under Rhines v. Weber, 544 U.S. 269, 277 (2005); (b) file an Amended Petition deleting the unexhausted claim; or (c) show cause in writing why his Petition should not be dismissed without prejudice. Dkt. 12 at 4.

After asking for and receiving an extension of time, Petitioner did not submit a timely response to the Court's OSC. Accordingly, on January 29, 2015, this Court issued an order dismissing the Petition without prejudice. Dkt. 15. The Court also informed Petitioner that if he still desired to pursue this action, he could file a First Amended Petition that omitted the unexhausted claim within thirty days. Id. at 7.

On February 6, 2015, Petitioner filed a First Amended Petition, which did not include the unexhausted instructional error claim. Dkt. 16 ("FAP"). The FAP raises the following exhausted claims for relief: (1) the trial court gave erroneous instructions regarding the mental state required for child endangerment in violation of Petitioner's federal constitutional rights to due process and a fair trial ("Ground One"); and (2) the trial court violated his federal constitutional right to due process by imposing a consecutive sentence for burglary rather than staying the sentence on that count under California Penal Code § 654 ("Ground Two"). FAP at 5-6.[1]

///

---

[1] All page citations to documents in this Court's record are to the CM/ECF pagination.

3

Respondent filed an answer to the FAP on April 28, 2015. Dkt. 21 ("Answer"). Petitioner has not filed a timely reply.

**B.**     **<u>Summary of the Evidence Presented at Trial</u>**

The underlying facts are taken from the unpublished opinion of the California Court of Appeal.[2] LD 1 at 2-5. Unless rebutted by clear and convincing evidence, these facts are presumed correct. <u>Tilcock v. Budge</u>, 538 F.3d 1138, 1141 (9th Cir. 2008); 28 U.S.C. § 2254 (e)(1). Petitioner has not attempted to overcome the presumption with respect to the underlying facts.

Petitioner and Amy W. were in a romantic relationship from 2001 until 2007. Their son G. was born in 2006. Amy W. obtained multiple restraining orders during the relationship due to Petitioner's physically abusive behavior. After the relationship ended, Petitioner tried to reconcile with her and was jealous of her involvement with other men, including Erik Skupian. On one occasion, Petitioner and Skupian fought after Petitioner grabbed Amy W. at a party.

On July 6, 2010, Amy W. was living in a condominium with G. and her 14-year-old son from a prior relationship. That morning, Amy W. was in her condo with Skupian and a neighbor when Petitioner left a voicemail message stating that he needed to talk to her. Shortly thereafter, Skupian saw Petitioner looking into the condo through the sliding glass door in the backyard. Skupian told Amy W., who began locking all the doors. At that point, Petitioner began calling and texting Amy W. After confirming that Petitioner had dropped G. off at day care, Amy W. called the

---

[2] In all quoted sections of the Report and Recommendation, the term "appellant" has been replaced with "Petitioner."

police and reported that Petitioner had been in her backyard in violation of a restraining order. Later that morning, Petitioner sent Amy W. a text message stating, "You ruined everything. Hope he is worth it."

Around 6:00 that night, Petitioner went to a friend's home and told him "he was afraid he was going to do a year in jail" for violating Amy W.'s restraining order. Petitioner said he "would rather shoot [Amy W.] instead of just go to jail for a year." A few hours later, Petitioner sent his sister a text message stating, "Good-bye. I love you. I am done. Last time getting screwed by Amy." In another message, Petitioner asked his sister to "try to help dad raise [G.]"

At around midnight, Amy W. and Skupian were in Amy W.'s upstairs bedroom while G. was sleeping in his bedroom next door. Skupian opened the sliding glass door to the balcony and saw Petitioner walking underneath the balcony with a baseball bat in his hand. Skupian told Petitioner he should leave and said he was going to jail. Petitioner replied, "[F]uck you. I'm going to kill you." Petitioner pulled out a revolver and fired it at Skupian, narrowly missing his head.

Skupian told Amy W. that Petitioner had a gun and they both ran out of the bedroom. As Amy W. ran into G.'s bedroom, Petitioner broke the backyard sliding glass door with the baseball bat and entered the condo. Skupian ran into Amy W.'s other son's bedroom and managed to escape onto the balcony. As Skupian was climbing over the balcony, he saw Petitioner in the hallway at the top of the stairs. Skupian made eye contact with Petitioner, then heard a gunshot as he fell to the ground outside. Skupian

5

pounded on a neighbor's window but received no response. After hearing several more gunshots and Amy W.'s screams, he ran to a nearby restaurant and called 911.

Amy W. called 911 from G.'s bedroom and blocked the closed door with her body. Petitioner managed to get into the room and hit Amy W. with the baseball bat before shooting her point-blank in the right arm. Amy W. attempted to grab the gun away from Petitioner. As she struggled with Petitioner, she managed to put her hands on the gun and kept firing it until she thought it was empty. She then dropped the gun and collapsed against G.'s bed.

After Petitioner fled, Amy W.'s neighbors went to her condo and heard someone moaning upstairs. They entered G.'s bedroom and found Amy W. sitting on the floor covered in blood. G. was sitting on his bed crying and said, "daddy hurt mommy bad." When Amy W.'s brother-in-law arrived to get G., the child was "shaking" and said he had a stomach ache. G. told his uncle that "tonight my dad shooted my mom in the head and there was lots of blood" and "when she was on the ground, he broked her arm with a bat."

When the police arrived, Petitioner started waving the baseball bat and yelled, "it's me over here." Petitioner complied with orders to drop the bat, then started moving toward one of the officers. When Petitioner saw Skupian coming up behind the officer, he started chasing Skupian while yelling that he was going to kill him. Petitioner was tasered after he ignored the officers' commands to stop.

Police investigators found a revolver with five expended

6

shell casings on the floor in G.'s bedroom. Three bullet holes were found in the wall between G.'s bedroom and the adjacent bathroom, and there was blood spatter on G.'s bed. Another bullet hole was found in the boards surrounding the walkway to the condo.

Amy W. suffered gunshot wounds on her scalp and arm and her nose and arm were fractured. The doctor who examined her indicated she was "very fortunate" not to have been killed or have suffered any serious brain or cranial injuries.

Petitioner suffered a gunshot wound to his abdomen. A blood sample taken shortly after his arrest indicated a blood alcohol level of .20 percent.

Petitioner testified on his own behalf. On the morning of the incident, he had custody of G. and was planning to take him to Amy W.'s house instead of day care. He called Amy W. and left a message to let her know he was coming. When he arrived at Amy W.'s condo, he walked to the back instead of going to the front door because G. told him Skupian was there. After looking through the sliding glass door and seeing that people were there, he took G. to day care and went to work. Petitioner then tried to reach Amy W. by calling and texting her. Amy W. eventually sent a text message stating that she was calling the police to report he had violated the restraining order.

After leaving work at around 5:00 p.m., Petitioner had two margaritas at a restaurant. He then drank two 24-ounce beers as he drove to his friend's house, where he had two more cocktails. Petitioner was upset because he and Amy W. had rekindled their relationship the prior weekend and he had told her he did not want

7

Skupian around anymore. He was also upset that Amy W. was going to report a restraining order violation again.

At some point, Petitioner bought more alcohol and drove to his father's house. After a brief visit, he bought even more alcohol and went home. He texted back and forth with his sister and said he wanted to kill himself because Amy W. had "cheated on [him] again." His plan was to go to Amy W.'s condo and "blow [his] head off in front of her."

Petitioner drove to Amy W.'s condo and got out of his truck armed with a revolver and a baseball bat. As he stood in the parking lot outside the condo, he "started having doubts" and "couldn't get the thought of [G.] out of [his] head." He then heard Skupian yelling that they were going to call the police. Petitioner wanted to get Skupian out of the condo, so he shot up toward the balcony. He was not trying to shoot Skupian, but rather only wanted to hit the sliding glass door.

Petitioner went through the front gate and broke the sliding glass door. He ran upstairs and went into Amy W.'s bedroom and then G.'s bedroom. When he entered the room he saw Amy W. "sort of like stand-sitting with her butt kind of on the edge of the bed directly in front of [him]." He did not see G. Petitioner swung the bat and hit Amy W. in the arm "really hard," although it "wasn't [his] plan" to do so and he "didn't want to hurt her." As he hit Amy W. with the bat, he "heard the gun fire." Amy W. fell to the ground and Petitioner shot her in the shoulder. As he put the gun to his own head, he heard G. talking to him and noticed for the first time he was in the room. At that point he dropped the gun and left.

8

LD 1 at 2-5.

## II.

## STANDARD OF REVIEW

Petitioner's claims are subject to the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, federal courts may grant habeas relief to a state prisoner "with respect to any claim that was adjudicated on the merits in State court proceedings" only if that adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Overall, AEDPA presents "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, --- U.S. ---, 134 S. Ct. 10, 16 (2013). AEDPA presents "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, --- U.S. ---, 131 S. Ct. 1388, 1398 (2011) (internal quotation marks omitted). The prisoner bears the burden to show that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). In other words, a state-court "determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness" of that ruling. Id. at 101 (internal quotation marks omitted). Federal habeas corpus review therefore serves as "a guard against extreme malfunctions in the state

9

criminal justice systems, not a substitute for ordinary error correction through appeal." Id. at 102-03 (internal quotation marks omitted).

Here, Petitioner raised Ground One on direct appeal and that claim was denied by the California Court of Appeal in a reasoned decision. See LD 1 at 5-8. Thus, for purposes of applying the AEDPA standard of review, the California Court of Appeal decision on direct appeal constitutes the relevant state court adjudication on the merits for the claim presented in Ground One. See Johnson v. Williams, --- U.S. ---, 133 S. Ct. 1088, 1094 n.1 (2013) (noting that federal habeas court "look[s] through" summary denial of claim to last reasoned decision from the state courts to address the claim).

Ground Two was presented for the first time in a habeas petition to the California Supreme Court, which summarily denied the claim.[3] See LD 2 at 19-25; LD 3. Accordingly, with respect to Ground Two, the relevant state court decision for purposes of AEDPA review is the decision of the California Supreme Court. See Pinholster, 131 S. Ct. at 1436, n.12 ("Under California law, the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that 'the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief.'" (citation omitted)). Where AEDPA applies to claims that were denied without explanation on the merits by the state courts, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. Consequently, without explicit explanation from the state courts, "[u]nder § 2254(d), a habeas court must

---

[3] Although Petitioner contended before both the California Court of Appeal and California Supreme Court that the trial court erroneously imposed a consecutive sentence for burglary, he framed his argument as a federal constitutional claim only in his petition for review in the California Supreme Court. See LD 2 at 19-25; Supp. LD 7 at 18-26.

10

determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." Id. at 102.

## III.

## DISCUSSION

**A.    Petitioner's Claim of Instructional Error Does Not Warrant Habeas Relief**

In Ground One, Petitioner argues that the trial court violated his federal constitutional rights to due process and a jury trial by giving the jury "erroneous instructions regarding the mental state required" for child endangerment under California Penal Code § 273a(a). FAP at 5.

**1.    Factual Background**

At trial, the jury was instructed with a modified CALCRIM No. 821, which provides, in pertinent part, as follows:

The defendant is charged in Count 3 with child abuse likely to produce great bodily harm/ [or] death in violation of Penal Code section 273a(a).

To prove that the defendant is guilty of this crime, the People must prove that:

1. The defendant willfully inflicted unjustifiable physical pain or mental suffering on a child;

2. The defendant willfully caused or permitted a child to suffer unjustifiable physical pain or mental suffering;

AND

3. The defendant (inflicted pain or suffering on the child/ [or] caused or permitted the child to (suffer/ [or] be

11

injured/ [or] be endangered)) under circumstances or conditions likely to produce (great bodily harm/ [or] death)(;/.)

Clerk's Transcript on Appeal ("CT") 100; see also LD 1 at 5-6. The instruction as given omitted the definition stating that "[s]omeone commits an act *willfully* when he or she does it willingly or on purpose." CT 100; CALCRIM No. 821.

The trial court also instructed the jury with CALCRIM No. 250 on general intent:

> The crimes or other allegations charged in this case requires proof of the union, or joint operation, of act and wrongful intent.
>
> For you to find a person guilty of the crimes in Count 3 and Enhancements 1 thru 5, that person must not only commit the prohibited act or fail to do the required act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act or fails to do a required act; however, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime or allegation.

CT 121; see also LD 1 at 5.

Following the commencement of deliberations, the trial court received a question from the jury asking, "Re: Count 3 Clarification of 'willfully' in pts 1 and 2. Is 'willfully' the same as 'intentionally'?" CT 42. The court answered, "It is not the same as the word intentionally." CT 43. The jury later asked the trial court, "Re: Instr. #821 Please address the difference between 'willfully inflicted' and 'willfully caused or permitted', please." CT 45. The court responded by referring the jury to CALCRIM No. 250. Id. Subsequently, the jury inquired, "In regards to child endangerment, does the wrongful intent (stated in #250) have to be directed towards the child, or does the wrongful intent mean the defendant did any prohibitable act that causes mental anguish

12

in a child." CT 46. The court answered the question, "It is a general intent crime; it is not a specific intent crime. Please refer to the instruction on general intent." CT 47.

### 2.    Decision of the California Court of Appeal

On direct appeal, Petitioner contended that the trial court's omission of the element of child endangerment that requires a defendant's actual awareness of the child's presence violated his federal constitutional due process rights. See Supp. LD at 6-14. The California Court of Appeal rejected Petitioner's claim of instructional error as follows:

> Here, the jury was instructed pursuant to CALCRIM No. 821 that in order to find Petitioner guilty of violating subdivision (a) of section 273a, the People had to prove that Petitioner both "willfully inflicted unjustifiable physical pain or mental suffering on a child," *and* "willfully caused or permitted a child to suffer unjustifiable physical pain or mental suffering[.]" The jury was further instructed pursuant to CALCRIM No. 250 that the People had to prove the crime was committed with general intent. As Petitioner correctly points out, the instructions as given were erroneous to the extent they required the jury to find Petitioner had violated the statute through both active and passive conduct. This error, however, inured to Petitioner's benefit in that it compelled the People to prove more than was necessary to obtain a conviction.

> Moreover, the omitted element Petitioner purports to identify is inherent in the instructions that were given. Under those instructions, the jury had to find that Petitioner willfully, i.e., willingly or purposefully, inflicted unjustifiable physical pain or mental suffering on G. The jury could not have made such a

13

finding had it not also found that Petitioner was aware of G.'s presence in the room when he attacked Amy W.

Petitioner's reliance on People v. Williams (2001) 26 Cal.4th 779 is misplaced. In Williams, our Supreme Court concluded that while assault is a general intent crime, the jury must also be instructed that the crime "requires actual knowledge of those facts sufficient to establish that the offending act by its nature would probably and directly result in physical force being applied to another." (Id. at p. 784.) Although the court has also recognized the similarities between assault and felony child abuse involving direct infliction of harm in concluding the latter is a crime of general intent (People v. Sargent, supra, 19 Cal.4th at p. 1220), assault proscribes a much broader category of conduct. To be convicted of assault, the defendant need only willfully commit an act that is likely to result in a battery; no intent to commit a battery need be proven. To distinguish the crime from mere criminal negligence, it is thus logically necessary to require a finding that the actor was subjectively aware of the underlying facts. By contrast, under the relevant prong of section 273a, the defendant must be found to have willfully inflicted unjustifiable physical pain or mental suffering upon a child. In other words, there must exist an intent to commit that particular act. (Id. at p. 1222 ["The actus reus for section 273a [subdivision (a)] is infliction of unjustifiable physical pain or mental suffering on a child. Hence, the scienter requirement applies to such an act"].) Such a finding is necessarily predicated on the defendant's knowledge of the child's presence.

Even if Petitioner could establish the error of which he complains, it would be harmless. As the People persuasively put it,

14

"it is simply inconceivable that Petitioner would not have known that [G.] would be in his bedroom at that time of night." Accordingly, any error in failing to instruct the jury that Petitioner had to be aware of G.'s presence was harmless beyond a reasonable doubt. (Chapman v. California (1967) 386 U.S. 18, 24; People v. Flood (1998) 18 Cal.4th 470, 502–503.)

LD 1 at 6-8 (footnotes omitted).

**3.    Analysis**

Challenges to state jury instructions are generally questions of state law and are thus not cognizable on habeas review. See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). In order to merit federal habeas relief on a claim that the trial court erred by failing to properly instruct a jury, a petitioner must show the trial court committed an error that "so infected the entire trial that the resulting conviction violates due process." Id. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431 U.S. 145, 154 (1977). When a petitioner's claim is based on an omission or an incomplete instruction, his burden is especially heavy. Id. at 155 ("An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."). In making this determination, the jury instruction "may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." Waddington v. Sarausad, 555 U.S. 179, 191 (2009) (internal quotation marks omitted). Even if Petitioner can demonstrate that the instruction violated his right to due process, habeas corpus relief may only be granted if the error had a "substantial and injurious effect or influence in determining the jury's verdict."

15

1  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (citation omitted); see also

2  Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).[4]

3      Reviewing the instructions given to the jury, particularly in the context

4  of the instructions as a whole, the Court cannot agree with Petitioner that the

5  challenged instructions improperly implied that he could be convicted of child

6  endangerment even if he lacked actual awareness of G.'s presence in the

7  child's bedroom at the time he attacked Amy W. To the contrary, as the Court

8  of Appeal found, "it is inherent in the instructions that were given" that

9  Petitioner had to be aware G. was present in the room when he assaulted Amy

10 W. in order to find that Petitioner "*willfully* inflicted unjustifiable physical pain

11 or mental suffering on" G. See LD 1 at 7 (italics added).

12      Petitioner argued on appeal that the trial court's answers to the jury's

13 questions regarding the difference between "willfully" and "intentionally" and

14 general intent confused the jury. See LD 2 at 14-16; Supp. LD 7 at 12-14.

15 However, Petitioner has not shown that the term "willfully" is susceptible to a

16 meaning that would have allowed the jury to find that Petitioner "willfully

17 inflicted unjustifiable physical pain or mental suffering on" G., but was not

18 aware of G.'s presence during the attack. Thus, it cannot be said that giving the

19 modified CALCRIM No. 821 in conjunction with CALCRIM No. 250 "so

20 infected the entire trial that the resulting conviction violates due process." See

21 Cupp, 414 U.S. at 147.

22      Even if the Court assumes that the trial court erroneously instructed the

23 ─────────────────

24      [4] The Court applies Brecht independently of the California Court of
   Appeal's harmless error analysis. See Dixon v. Williams, 750 F.3d 1027, 1034-

25 35 (9th Cir. 2014) (holding that federal courts apply Brecht standard without
   regard for the state court's harmlessness determination); see also Fry v. Pliler,

26 551 U.S. 112, 120 (2007) ("[I]t certainly makes no sense to require formal
   application of both tests (AEDPA/Chapman and Brecht) when the latter

27 obviously subsumes the former.").

28

jury regarding the mental state required for child endangerment, any such error was harmless under <u>Brecht</u>. As the California Court of Appeal observed, it was "simply inconceivable" that Petitioner would not have been aware that G. "would be in his bedroom at that time of night." LD 2 at 8. Indeed, when Amy W.'s neighbors entered her condo after the attack, they immediately saw that G. was sitting on his bed in the room behind where Amy W. was sitting on the floor covered in blood. <u>See</u> 7 Reporter's Transcript ("RT") 1812, 1824, 1868. Additionally, it was immediately evident to the investigators and law enforcement personnel who arrived at the condo that the room where the assault had taken place was a child's room. <u>See</u> 8 RT 2166 ("It was obvious it was a child's room. There were toys on the floor and children's clothing."); <u>see also</u> 9 RT 2431 ("When I entered, it looked like a child's bedroom."). Moreover, Petitioner admitted that he knew that he had gone into G.'s room and saw that Amy W. was leaning on the edge of the bed. <u>See</u> 11 RT 3053, 3057, 3081-82. Conversely, there was no evidence, aside from Petitioner's own testimony, which the jury reasonably found not credible, that he was not aware of G.'s presence.

Given the weighty evidence that Petitioner would have known G. was in the room during the attack, it is "reasonably probable that the jury would still have convicted [Petitioner] on the proper instructions." <u>See</u> <u>Babb v. Lozowsky</u>, 719 F.3d 1019, 1034 (9th Cir. 2013). Accordingly, Petitioner has not shown that the trial court's instructional error had a substantial and injurious effect or influence in determining the jury's verdict. <u>See</u> <u>Brecht</u>, 507 U.S. at 638. Petitioner's claim therefore does not warrant federal habeas relief.

**B.** **Petitioner's Claim of Sentencing Error Is Not Cognizable in Federal Habeas Corpus**

In Ground Two, Petitioner argues that the trial court violated his federal constitutional rights to due process when it separately punished him for both

17

burglary and involuntary manslaughter by imposing statutorily unauthorized consecutive sentences. FAP at 5-6.

### 1.   Factual Background

"In sentencing Petitioner on the burglary count, the court imposed a consecutive one-year, four-month prison term plus four months for the firearm enhancement." LD 1 at 8. Petitioner argued before both the California Court of Appeal and California Supreme Court that sentencing on the burglary count should have been stayed under California Penal Code § 654 because the burglary was incidental to the attempted voluntary manslaughter for which he was separately sentenced. LD 2 at 19; Supp. LD 7 at 18.

The California Court of Appeal concluded:

> We agree with Petitioner that no evidence in the record supports the court's finding he entertained separate intents and objectives in shooting at Skupian before and after Petitioner entered the condo. Petitioner was charged in only one count for attempting to kill Skupian. Moreover, the prosecution argued that the shots Petitioner fired both inside and outside the condo were part and parcel of that attempt. The only reasonable inference to be drawn from this evidence is that Petitioner fired the first shot in an attempt to kill Skupian, then committed the burglary in order to "finish [the] job." Indeed, the court expressly so found. In this regard, this case is no different from others in which punishment for either the burglary or the attempted killing was proscribed under section 654. (See, e.g., People v. Price (1991) 1 Cal.4th 324, 492 [section 654 barred multiple punishment for defendant who committed burglary with the intent to commit murder]; see also People v. Mesa (2012) 54 Cal.4th 191, 198 ["Section 654 applies where the 'defendant stands convicted of both (1) a crime that

requires, as one of its elements, the intentional commission of an underlying offense, and (2) the underlying offense itself' "].)

In asserting that section 654 did not apply, however, the prosecutor correctly argued that where there is "a burglary and a subsequent assaultive crime when there's more than one victim and either great bodily injury or use of a firearm," the statute "does not preclude punishment for both the burglary and the assaultive crime against one of the burglary victims." Here, the jury expressly found that Petitioner personally used a firearm in committing the burglary. The jury further found true the enhancement allegation that Amy W. was present when the burglary occurred. In this regard, Amy W. was identified as a victim of the burglary. The fact that she was in her own home when the burglary occurred also makes her a victim of the crime. (People v. Centers, supra, 73 Cal.App.4th at p. 101.) Skupian was the sole victim of the attempted voluntary manslaughter. Because the jury expressly found there was a victim of the burglary and attendant personal firearm use who was not also a victim of the attempted voluntary manslaughter, separate punishment for both crimes is consistent with section 654's purpose of insuring that punishment will be commensurate with the defendant's culpability. (Id. at pp. 101–102.)

In light of our conclusion that the multiple victim exception to section 654 applies as a matter of law based on findings made by the jury, we affirm the court's section 654 ruling notwithstanding its erroneous finding that the burglary and attempted manslaughter were committed pursuant to separate intents and objectives. " ' "No rule of decision is better or more

19

firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." ...' " (<u>People v. Zapien</u> (1993) 4 Cal.4th 929, 976.) There is no issue as to notice here because the prosecution argued below that the multiple victim exception to section 654 applied.

LD 1 at 11-12 (footnote omitted).

When Petitioner filed his petition for review in the California Supreme Court, he made substantially the same arguments made to the state appellate court, but also contended that the imposition of a consecutive sentence for burglary violated his federal constitutional rights to due process. <u>See</u> LD 2 at 19-25; Supp. LD 7 at 18-26. The California Supreme Court denied review without comment. LD 3.

### 2.    Analysis

Matters relating to state sentencing are governed by state law and generally are not cognizable on federal habeas review. <u>See, e.g.</u>, <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990) (rejecting petitioner's claim that a state court misapplied its own aggravating circumstance law because "federal habeas corpus relief does not lie for errors of state law"). Petitioner's contention that the imposition of sentences for both burglary and attempted voluntary manslaughter violated California Penal Code § 654 is not cognizable in federal habeas law absent a showing of fundamental unfairness. <u>See</u> <u>Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 507 (9th Cir.1994) ("The decision whether to impose sentences concurrently or consecutively is a matter of state criminal procedures and is not within the purview of federal habeas corpus."); <u>Christian</u>

v. Rhode, 41 F.3d 461, 469 (9th Cir.1994) ("Absent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief."); Watts v. Bonneville, 879 F.2d 685, 687 (9th Cir.1989) (holding that petitioner's claim that his sentence violated California Penal Code § 654 was not cognizable on federal habeas review).

To state a cognizable federal habeas claim based on a claimed state sentencing error, a petitioner must show that an alleged state sentencing error was "so arbitrary or capricious as to constitute an independent due process" violation. Richmond v. Lewis, 506 U.S. 40, 50 (1992); see also Christian, 41 F.3d at 469 ("Absent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify habeas relief.").

Here, the California Court of Appeal concluded that the trial court properly applied state law in imposing consecutive sentences for burglary and involuntary manslaughter, and in summarily denying Petitioner's petition for review, the California Supreme Court determined that Petitioner failed to state a prima facie case entitling him to relief. See Pinholster, 131 S. Ct. at 1402, n.11. This Court is bound by the state courts' interpretation of California Penal Code § 654. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

To the extent Petitioner claims that the imposition of a consecutive sentence for burglary constitutes a due process violation, Petitioner has not even attempted to show that his sentence was fundamentally unfair; rather, he simply claims that the trial court failed to follow state law. See FAP at 5 ("Trial court violated petitioners [sic] federal constitutional rights to due process of law by imposing statutorally [sic] unauthorized con. sentence for burglary count."). However, a petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process." See Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996).

///

21

Based on the foregoing, Petitioner has not shown a due process violation or that the imposition of a consecutive sentence for burglary was fundamentally unfair, much less that there was no reasonable basis for the state courts to deny relief. Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

## IV.

## CONCLUSION

IT IS THEREFORE ORDERED that the First Amended Petition is DENIED. Let judgment be entered dismissing this action with prejudice.

Dated:  September 29, 2015

_____
DOUGLAS F. McCORMICK
United States Magistrate Judge

22